### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case No. 21-0139-02 (TNM)** |
| | : | |
| **DANA JOE WINN,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT DANA JOE WINN'S  SENTENCING MEMORANDUM

The defendant, Mr. Dana Joe Winn, through his attorney, Allen H. Orenberg, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Winn, he has no objections. Mr. Winn requests that this Honorable Court impose, essentially, a sentence of a term of 12 months probation with community service to account for:

1.   His is lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach event, and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

2.   His immediate cooperation with  law enforcement officers when arrested, as well as his ongoing cooperation and willingness to resolve his case at the earliest opportunity.

Mr. Winn comes before the Court having plead guilty on October 4, 2021, to Count Two of the Information, charging him with a violation of Title 18 U.S.C.

§1752(a)(2). A sentence of 12 months of probation, with community service, is a reasonable sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a). Under the facts of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

1. **BACKGROUND**

   A. **Mr. Dana Winn Watches Media Coverage of The Black Lives Matter Protests of 2020 and Trump Denouncing the  2020 Election.**

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, especially in D.C., these protests turned violent. These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way racial justice could be effectuated. Mr. Winn watched from his home in Florida and on the internet as hundreds of businesses were destroyed over a period of weeks, several people were injured, and nearly two billion dollars of damage was done by rioters nationwide.

 After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others. False claims were made on media sources, as well as by the

President himself, that the election system had been corrupted and that the integrity of the election should be questioned. This Court can only understand why Mr. Winn came from Florida to D.C. when taking into account these two pivotal events in our nation's history. While consumption of media news is no excuse for behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country. The media sets the tenor for how people feel about their rights and freedoms and can also plant notions of discontent or even outrage. After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard. Additionally, because very few people were being prosecuted for their criminal behavior while violently protesting, which was replayed over and over again on the nightly news, the media helped reinforce the notion that there would be little to no consequences for protestor actions. Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting  federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible.  Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts. *https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mr. Winn, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020. He saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media

outlets for their strongly held beliefs. And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media framing… such as disproportionate coverage of violent demonstrations." https://time.com/5886348/report-peaceful-protests/.

Mr. Winn similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election that were not proper. He was also emboldened by a new understanding of how vocal and peaceful protests were being conducted in our country to garner attention for important issues effecting the future of our nation. He decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added). He did so with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election. He did not suit up for combat. He did not obscure his face. He was not armed and he carried an American flag, which was hung upside down on the flagpole to indicate a country in distress. Mr. Winn committed no violent actions in his peaceful protest. Mr. Winn did not destroy anything. Mr. Winn's only desire was to participate in a democratic process that is protected under the 1st Amendment of our Constitution. Unfortunately, going into the Capitol was not part of that democratic process and he now stands before the Court after admitting to the Court at his plea hearing that he knew going into the Capitol that day was wrong.

1.   **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

A.   **Mr. Winn's Trip to D.C. and His Walk to the Capitol**

Mr. Winn believed what he read on the internet and heard from the President himself - that the election had been stolen. He believed that there was wrongdoing in the State of Georgia with regard to the counting of the Presidential election votes. He also believed that he should show his support for the soon to be former President by attending this rally scheduled for January 6, 2021, at the Ellipse on the Mall. He had never attended any other political rallies or gatherings. Importantly, Mr. Dana Winn was fixated on the *process,* not the result of the election. The emphasis on the process, and not the result, is particularly important because it shows that Mr. Dana Winn values the Constitution and the foundation of our government.

Mr. Winn had always wanted to come to D.C., and this seemed to be the perfect opportunity. At the time, he was self-employed, like hundreds of thousands of other Americans who were similarly employed during the pandemic. His co-defendant Rachel Lynn Pert did not want him to go alone on this trip so she accompanied him to D.C. At no time prior to January 6th did he ever think he was going to the U.S. Capitol grounds, let alone inside the U.S Capitol building. Not until Trump's speech did he have any intention of going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, he had no real sense of where things were in relation to each other. As the day unfolded, he never planned or envisioned entering the U.S. Capitol building or grounds. That is, not until Trump invited everyone to march to the U.S. Capitol.

Mr. Dana Winn and his co-defendant followed the large crowd there that day with no intention of doing anything but having his voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Winn is regrets that he was a part of it, albeit a small part of it compared to the many violent protesters who actually assaulted police officers and caused damage to the U.S. Capitol.

### B. Mr. Dana Winn's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President. More than 30 minutes later, the Senate Wing Doors were penetrated by the crowd, pushing Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mr. Winn was not in this first wave of hundreds of protesters. In fact, the available video footage shows that he was at least hundreds of people back behind the original breach. He could not see what was transpiring inside the Capitol

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

building. He had no idea of the violence in other parts of the Capitol. In fact, Mr. Winn had been so far behind the first people in that he had no idea how the door was opened or who opened it. He was, in his words, "following others" up the outside stairs and eventually into the building. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Dana Winn's knowledge and intention* as the day unfolded. That is, though many others were violent, pushing officers, etc., Mr. Winn was not violent, carefully observed the situation around him, and acted with decency. (as we will see)

As they entered the Senate wing door, people around Mr. Winn began to celebrate. The mood was not unlike other protests in Washington, D.C., and many persons around took selfies and appeared peaceful with cameras and flags. He felt like he was on a tour of the U.S. Capitol and recalls that he was in a room with large columns and statues. While following the crowd aimlessly through the halls in the Capitol building, defendants Dana Winn and Ms. Pert were taking photos/videos with their cell-phones. While inside, Mr. Winn did not observe any destruction or bad behavior towards the police. However, when he looked out a window he did see police officers and the smoke of tear gas. Mr. Winn and Ms. Pert then made a decision to exit the U.S. Capitol building, which occurred at approximately 2:40 p.m. He estimates they were inside the building for approximately 20-30 minutes.

Once outside the U.S. Capitol building, Mr. Winn and Ms. Pert remained nearby for approximately 40 to 45 minutes. At approximately 3:20 p.m., Mr. Winn

and Ms. Pert heard word that former President Trump had asked everyone to leave the U.S. Capitol and grounds, so he and Ms. Pert did so.

Mr. Winn and Ms. Pert also heard there was a curfew, so they immediately went back to their hotel, spent the night, and drove home the next day. As stated in the statement of offense, there is no evidence defendants Dana Winn or Rachel Lynn Pert were violent or destructive on the grounds or inside the U.S. Capitol building. *See* Statement of Facts. (Doc. 39)

### C.   Hindsight is 20/20.

Now, in retrospect, Mr. Winn wishes he'd never come to D.C. at all, which is terribly sad because D.C. is incredible in so many ways. He never imagined going inside the U.S. Capitol building and certainly never thought that violence would follow. Importantly, Mr. Winn did not have any intention of stopping the vote. Indeed, Mr. Winn's aimless following of the crowd through the Capitol building and grounds that day is evidence of his lack of intent to do something in the Capitol building that day, his lack of understanding where he was in the Capitol building, and his herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate Chambers.

Mr. Winn's only intention that day was to have his voice heard. In fact, Mr. Winn had no idea where he was while he was in the U.S. Capitol building and to this day could not find his way around if given the opportunity.

### D.   The Charges and the Arrest of Mr. Winn

On January 25, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Winn and Ms. Pert with two

misdemeanor offenses related to their conduct on January 6. See Doc. 1.[2] He was informed there was an arrest warrant for him so he voluntarily surrendered himself to authorities on January 26, 2021, where he was presented the same day in the U.S. District Court for the Middle District of Florida (Jacksonville). He was released on personal recognizance by U.S. Magistrate Judge James R. Klindt, with conditions including a $10,000.00 unsecured appearance bond and GPS location monitoring, which was installed on January 26, 2021, and, later, un-installed on February 2, 2021. [3]

Mr. Winn had an initial appearance in the U.S. District Court for the District of Columbia on January 29, 2021, and, again, he was released on personal recognizance with conditions. *See* Doc. 13. On February 19, 2021, a five-count Indictment was lodged against Mr. Winn, alleging: (Count 1) 18 U.S.C. § 1512(c)(2) (Obstruction of An Official Proceeding), (Count 2) 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), (Count 3) 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), (Count 4) 40 U.S.C. § 5401(e)(2)(D) (Disorderly Conduct in a Capitol Building), and (Count 5) 40 U.S.C. § 5401(e)(2)(G)(Parading, Demonstrating or Picketing in a Capitol Building).

---

[2] Those two charges are: Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

[3] The initial charges and his arrest were widely publicized by various media outlets in the Jacksonville, Florida. After his release on January 26, 2021, both he and co-defendant Pert were literally "chased" for several blocks by news reporters as they left the U.S. Courthouse in Jacksonville, Florida.

On October 4, 2021, Mr. Winn appeared before this Honorable Court via video conference and the Court accepted his voluntary plea of guilty to Count 2 – 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds). The remaining Counts will be dismissed at the sentencing hearing.

## II.  **LEGAL STANDARD**

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense. Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision:

1.   The nature and circumstances of the offense and the history and characteristics of the defendant;

2.   The need for the sentence imposed;

3.   The kinds of sentences available;

4.   The kinds of sentence and the sentencing range…;

5.   Any pertinent policy statements issued by the Sentencing Commission;

6.     The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

7.     The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

### III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a). *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A.     Nature & Circumstances of the Offense & the History and Characteristics of Mr. Dana Winn

After Mr. Winn walked freely into the U.S. Capitol on January 6, 2021, he was in awe. He had never been to the U.S. Capitol before. He had to take a moment and let it soak in. Together, he and his co-defendant merely walked in, and through, then out of the building in a calm and non-agitated manner. Compared to many other misdemeanor cases which have been filed in this Court, Mr. Winn's conduct is at or near the bottom of the scale. First, the defense is not aware of any evidence that defendant's entry into the U.S. Capitol building was preplanned or coordinated with anyone else, including any extremist or organized groups. His intention was to attend the rally and that did not include going into the U.S. Capitol. Although he does have a co-defendant, the facts show that Mr. Winn acted in peaceful concert with her. Second, the defense is not aware of any evidence that the Defendant incited others to commit acts of violence or destruction. Third, the defense is not

aware of any evidence that the Defendant engaged in any violence or questionable conduct towards law enforcement. In fact, it's just the opposite. Mr. Winn told the FBI that every interaction he personally had with the police was a positive experience. Fourth, the defense is not aware of any evidence that Mr. Winn destroyed or stole any property from the U.S. Capitol building. Fifth, based on the Government's investigation, it appears that Mr. Winn remained in a limited part of the Capitol building for a limited period of time – 20-30 minutes – mostly in hallways or the Rotunda area. The defense is not aware of any evidence that Mr. Winn entered any rooms or offices in the Capitol building, any personal space or the Senate or House Chamber.

To his credit, Mr. Winn voluntarily surrendered himself when he heard that there was an arrest warrant for him. He later fully acknowledged his misconduct by answering pointed questions by the FBI agents in a post-plea interview, expressed true and full contrition, and voluntarily turned over evidence including the hotel receipt where he and his co-defendant stayed en route to D.C. He was relieved by the opportunity to take responsibility for his actions.

 Mr. Winn did not come to Washington, D.C., with the intention of subverting democracy. Mr. Winn came to Washington to peacefully protest what he believed at that time to be a fraudulent election. By the time Mr. Winn arrived at the U.S. Capitol around 2:00 p.m. on January 6th, many of the barriers that had been erected along the perimeter of the building and/or on the grounds were no longer present. Mr. Winn and his co-defendant met no resistance in their walk to and inside the Capitol building. At the time, Mr. Winn didn't dream he'd be charged for

going into the Capitol building.[4] After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mr. Winn cringe. He did not personally witness any of this at all. He is left with deep regret, fear, shame, and remorse.

The government concedes that Mr. Winn committed no violent acts and destroyed no property. His actions within the Capitol building have been tracked on the CCTV footage[5] and this demonstrates that while unlawfully present in the Capitol building with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful, even grateful. After Mr. Winn exited the Capitol building he heard that someone had been shot and there was a curfew beginning that evening. Importantly, like the first time Mr. Winn entered the Capitol building, there were no police officers telling him not to go up the steps.

This has been a long road for Mr. Winn, his family, and for his co-defendant Rachel Lynn Pert. Fortunately, he has a supportive relationship with his immediate

---

[4] Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021).  And to think that the lawyers that brought the frivolous election lawsuits have not been sanctioned is mind boggling. At the very least they should be reprimanded for filing the appeal in the Michigan case in the  Federal Circuit instead of the Sixth Circuit.

[5] Since Mr. Dana Winn plead guilty, the Government, in an effort to support their request for jail time, has scoured additional CCTV and other video footage in an attempt to "catch" Mr. Dana Winn engaging in violence. After several more discovery productions since his plea, there is none.

family who has stood by him since the beginning of this case and a supportive extended family.

Mr. Winn pled guilty at an early stage in the proceedings thus saving valuable judicial resources. It is of utmost importance to Mr. Winn that this Court understand that he is incredibly remorseful for his actions on January 6, 2021. There is no doubt that, as he expressed when interviewed by law enforcement, he wishes he had never come to Washington, D.C. on that day. Mr. Winn has endured life-long damage to his reputation. None of this will be erased from the internet – it may be there forever. He has fully accepted responsibility for his bad judgement in entering the Capitol building by pleading guilty in what can be described as the "first wave" of defendants that have pled guilty. He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021, many of whom committed violent and/or destructive acts and are according charged. His personal character and reputation will forever be tarnished. Mr. Winn's family, including his mother, a son, and his fiancé, will suffer as well since they are inextricably intertwined with him and the widely publicized events of January 6, 2021.

Mr. Winn does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there. Most telling about Mr. Winn is despite all he has been through this past year, he continues to work full time and is otherwise a well-respected member of his community. As noted in the PSR, Mr.

Winn has had minor contacts with the criminal justice system and he is deemed a criminal history category I. His law abiding life and his post arrest behavior show that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of probation considering the §3553 factors.

Mr. Winn was born in Florida where he has resided all of his life. (Except when he was in the U.S. Navy [6]) He was raised by both natural parents, even though they divorced when he was young. He was particularly close to his father, who lived with his son for the past several years until he passed away from COVID-19 in February, 2021. And Mr. Winn remains close to his mother, who is retired and lives a few hours away from her son. Mr. Winn's mother re-married and he enjoys a good relationship with his step-father. He also has a good relationship with a half-brother and has periodic contact with his natural brother who, unfortunately, is incarcerated. Mr. Winn has a son, age 21, and they have a very close relationship.

Since 2015, Mr. Winn has been in a relationship with co-defendant Rachel Lynn Pert although, at this time, they might not be in a close relationship. Ms. Pert has three children from previous relationships and Mr. Winn is close to all of these children. He and Ms. Pert operate, together, a business which specializes in home building and renovations. The business, essentially, provides/installs cabinets for new and older homes, as well as cleaning services on construction sites. This is his sole source of income. Through this business enterprise he supports himself.

---

[6] While in high school he participated in ROTC. Upon graduation in 1994, Mr. Winn enlisted (delayed entry program) in the U.S. Navy and achieved the rank of Petty Officer Third Class (E-4). He was honorably discharged in 1999. Thereafter, he joined the U.S. Navy Reserves for two years.

Attached to this memo is a letter from Ms. Darby N. Keene who has known Mr. Winn for four years. She describes Mr. Winn's excellent reputation in Middleburg, Florida, community. And she informs the Court that Mr. Winn is a person who "works very hard for a living, he is very caring, and he loves God and his country." Respectfully, this letter of support illustrates that a sentence of probation is appropriate in this case.

    **B.**    **Need for the Sentence imposed**

    **1.**    **General Deterrence – 18 U.S.C. § 3553(a)(2)(B) –
to Adequately Deter Others From Criminal Conduct.**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation. The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the U.S. Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a family impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A period of probation does constitute punishment and will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. The National Institute of

Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

### 2.    Specific Deterrence – 18 U.S.C. § 3553(a)(2)(C) – to Protect the Public From Further Crimes of the Defendant

Mr. Winn's likelihood of recidivism is very low. He has expressed genuine remorse and contrition, has cooperated fully with law enforcement, turned over evidence voluntarily, and he accepted the first plea offer tendered with no hesitation. His acceptance of responsibility was complete and without reservation. He has never tried to minimize his behavior. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; See *also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several

European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given Mr. Winn's age (46), and other issues consistent with what is mentioned above, the likelihood of Mr. Winn ever re-offending is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.[7]

### C.  <u>The Kinds of Sentences Available</u>

The adjusted base offense level is 4 and the criminal history category is I. *See* PSR, ¶¶39, 45. The resulting advisory sentencing guidelines range is 0-6 months imprisonment and this falls within Zone A on the Sentencing Table. Pursuant to U.S.S.G. §5B1.1(a)(1), a term of probation is authorized.

---

[7]

 For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 29 (May 2004).

When fashioning an appropriate sentence, the Court should not consider any conduct that Mr. Winn did not plead guilty to. Furthermore, the PSR states that "It does not appear that Mr. Winn exercised managerial authority over any other participant. . . . was average participant whose conduct was not peripheral to the advancement of the offense. Therefore, Mr. Winn does not merit an aggravating or mitigating role adjustment, USSG §§ 3B1.1 or 3B1.2." *See* PSR ¶ 26.

Largely because of his family and business obligations, Mr. Winn asks that the Court adopt the recommendations of the U.S. Probation Office and impose a term of 12 months probation with community service hours. In the alternative, he asks that the Court consider a non-custodial sentence with a restriction that he remain on his property except for work and excused absences to go to church and medical appointments. In the event the Court finds a period of incarceration warranted, Mr. Dana Winn asks that he be allowed to serve it on weekends which is what this Court did in *United States v. Johnny Taylor,* 15-cr-76 (BAH).

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case. Defendant's financial condition is such that he cannot pay any significant fine. *See* PSR, paragraph 85; U.S.S.G. § 5E1.2(a) (fine not recommended if defendant unable to pay).

### D.     The Need to Avoid Unwarranted Sentence Disparities

If this Court were to impose a sentence greater than a probationary term, community service, and restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.

The following cases are a sampling where, in January 6th U.S. Capitol breach cases, a misdemeanor(s) was charged and pled to and, for the most part, resulted in no incarceration. Mr. Winn's case is similar to:

- *United States v. Eliel Rosa*, 21-cr-00068 (TNM) (Oct.12, 2021) (sentenced to 12 months probation – Mr. Rosa accepted responsibility early on, did not pre-plan or coordinate activities, and did not go far into the U.S. Capital building.)

- *United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to 36 months probation).

- *United States v. Jennifer Parks,* 21-cr-00363 (CJN) (Dec. 8, 2021) (sentenced to 24 months probation where govt. ask for 30 days home detention.

- *United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to 36 months probation).

- *United States v. Jonathan Sanders,* 21-cr-00384 (CJN) (Nov. 4, 2021) (sentenced to 36 months probation where defendant showed lack of remorse during an FBI interview, and govt. recommended 2 months home detention ).

- *United States v. Jordan Stotts,* 21-cr-00272 (TJK) (Nov. 9, 2021) (sentenced to 24 months probation where defendant shouted at MPD officers and posted non-remorseful comments following January 6th ).

Furthermore, Mr. Winn's case may be distinguished from a sampling of cases where the sentence imposed was more than just probation:

- *United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to 2 months home detention even though she entered through a broken window and yelled at police officers).

- *United States v. Andrew Bennett,* Crim. No. 21-227(JEB)(Oct 1, 2021)(sentenced to three months home confinement and 36 months probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about her conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a

whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to her Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began live-streaming video to her Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to live-stream events inside the building.

- *United States v. Derek Jancart and Erik Rau*, 21-cr-00467 (JEB)(Sept. 29, 2021) Judge Boasberg sentenced both defendants to 45 days of incarceration. However, in that case, unlike Mrs. Spencer's, the prosecutors asked for four (4) months of incarceration for each defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mrs. Spencer, was on probation at the time of her offense on January 6 for domestic violence.

- *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(Oct. 4, 2021). (45 days of incarceration, defendant blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/

- *United States. v. Reeder*, 21 CR 166(TFH)(Oct. 8, 2021), (Defendant sentenced to 90 days incarceration, bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about her actions and deleted social media accounts, and most importantly, put her hands on a police officer. Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances)

None of this is to suggest that any of these examples should have received a sentence of /incarceration home detention, only to suggest that there is nothing materially different about Mr. Winn or his conduct which would justify a sentence of incarceration/home incarceration. Judges of this district court have sentenced some January 6th misdemeanor cases to home detention/incarceration. However the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, are based on far more egregious conduct than the conduct of Mr. Winn – and therefore are readily distinguished.

And Mr. Winn was far more cooperative with law enforcement, did not attempt to hide any evidence, and he has not publicly blamed another group for the violence that day. All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Winn's conduct and characteristics. As suggested by U.S. Probation in its sentencing recommendation, Mr. Winn's actions fall on the low-end of the spectrum that day and his culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons and such other reasons that may appear just and proper, Mr. Dana Joe Winn respectfully asks this Court to fashion a sentence of 12 months probation with community service hours. In the alternative, he asks that the Court consider a non-custodial sentence with a restriction that he remain on his property except for work and excused absences to go to church and medical

appointments. In the event the Court finds a period of incarceration warranted, Mr. Dana Winn asks that he be allowed the privilege of voluntary surrender and he also requests a judicial recommendation for designation to a BOP facility within the State of Florida.

This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, which will consider Mr. Winn as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

_____-S-_____
Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

Dated: December 13, 2021